UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

OSCAR RAY BOLIN, JR.,

      Petitioner,

-vs-                                                                        Case No. 8:10-cv-1571-T-27EAJ

SECRETARY, DEPARTMENT
OF CORRECTIONS,

      Respondent.

_____/

## ORDER

Before the Court is Oscar Ray Bolin, Jr.'s Petition for Writ of Habeas Corpus pursuant to

28 U.S.C. § 2254 (Dkt. 1). The petition raises two claims of ineffective assistance of counsel.

Respondent has responded in opposition (Dkt. 13), and Bolin, through counsel, filed a reply (Dkt.

19). At the direction of the Court, the parties filed supplemental briefing on whether the Petition

is time-barred. Upon consideration, Bolin's petition for federal habeas relief (Dkt. 1) is **DENIED.**

### Background

Bolin was convicted and sentenced to death for the murder of Teri Lynn Matthews. His

conviction was affirmed by the Florida Supreme Court. *Bolin v. State*, 869 So.2d 1196 (Fla.

2004), *cert. denied*, 543 U.S. 882 (2004).[1] He sought post conviction relief in a Florida Rule

3.851 motion, asserting seven grounds. After conducting an evidentiary hearing, the state trial

---

[1] This was the third time Petitioner was convicted and sentenced to death for the murder of Matthews. Petitioner was originally convicted and sentenced to death in 1992, but that conviction was reversed. *Bolin v. State*, 650 So.2d 19 (Fla. 1995). His second conviction and sentence of death was likewise reversed. *Bolin v. State*, 736 So.2d 1160 (Fla. 1999).

court denied the motion. The Florida Supreme Court affirmed. *Bolin v. State*, 41 So.3d 151 (Fla. 2010).

### Timeliness

Under the AEDPA, a federal habeas petition must be filed within one year from when a state court conviction becomes final.[2] 28 U.S.C. § 2244(d)(1)(A);*Wilcox v. Fla. Dep't of Corr.*, 158 F.3d 1209, 1211 (11th Cir. 1998).  The limitation period is tolled while a "properly filed" application for state post conviction relief is pending. 28 U.S.C. § 2244(d)(2).  A "properly filed" application complies with "the applicable laws and rules governing filings:"

> "[A]n application is ' properly filed' when its delivery and acceptance are in compliance with the applicable laws and rules governing filings. These usually prescribe, for example, the form of the document, the time limits upon its delivery, the court and office in which it must be lodged, and the requisite filing fee."

*Artuz v. Bennett*, 531 U.S. 4, 8 (2000).

Bolin's conviction became final for purposes of the AEDPA on October 4, 2004, when the Supreme Court denied *certiorari*. *Washington v. United States*, 243 F.3d 1299, 1300 (11th Cir. 2001).  His one year limitation period would therefore expire on October 4, 2005.

On October 3, 3005, one day before the AEDPA limitations period expired, Bolin filed, through counsel, a Florida Rule 3.851 motion seeking post conviction relief. Bolin contends that this filing tolled the AEDPA limitation period.

A properly filed Rule 3.581 motion would have tolled the AEDPA one year limitation period. 28 U.S.C. § 2244(d)(2). However, Respondent moved to strike Bolin's initial Rule 3.851 motion because it did not contain a legally sufficient oath (Dkt. 15; Ex. C1 at 110).  Bolin's Rule

---

[2]  The Antiterrorism and Effective Death Penalty Act, April 24, 1996 ("AEDPA").

3.851 motion was denied by the state court without prejudice because it included "an invalid oath, qualified with the language 'to the best of his knowledge.'" (Dkt. 15; Ex C 1, p. 112). The state court deemed the motion "legally insufficient." (Id.). On January 5, 2006, Bolin re-filed his Rule 3.851 motion with the required oath (Dkt. 15, Ex. C5). By that time, however, more than one year had passed since his conviction became final, specifically, 459 days.

Ultimately, Petitioner's Rule 3.851 motion was denied and the Florida Supreme Court affirmed. *Bolin v. State*, 41 So.3d 151 (Fla. 2010). That court's mandate issued on July 30, 2010. Bolin had already filed his federal habeas petition on July 16, 2010 (Dkt. 1). The issue is whether Bolin's initial Rule 3.851 motion was "properly filed" for tolling purposes under 28 U.S.C. § 2244(d)(2). Where a motion is not "properly filed," there is no tolling of the limitation period. *Sibley v. Culliver*, 377 F.3d 1196, 1202 (11th Cir. 2004).

A Florida Rule 3.851 motion for post conviction relief is required to be made under oath. Fla. R. Crim. P. Rule 3.851(e)(1) ("The motion shall be under oath . . ."); *Chavez v. Sec. Fla. Dep't of Corr.,* 647 F.3d 1057, 1064 (11th Cir. 2011), *cert. denied*, 132 S.Ct. 1018 (2012). Where, as here, a Florida post conviction motion does not include the required oath and as a result is denied by the state court, the motion is not "properly filed" under the AEDPA. *Hurley v. Moore,* 233 F.3d 1295, 1298 (11th Cir. 2000) (Florida Rule 3.850 motion which did not comply with oath requirement did not toll AEDPA limitation period), *cert. denied*, 532 U.S. 1013 (2001), *cert. denied*, 532 U.S. 1013 (2001).[3] Bolin's initial Rule 3.851 motion was therefore not "properly filed."

---

[3] Florida defendants sentenced to death seek post conviction relief under Rule 3.851 whereas non-capital defendants file under Rule 3.850. Both rules have identical provisions requiring the motions to be "under oath."

3

Nor did the filing of Bolin's second Rule 3.851 motion, which corrected the "invalid oath," relate back to his initial Rule 3.851 motion. *Sibley v. Culliver*, 377 F.3d at 1204.

> Petitioner may not attempt to resurrect a terminated statute of limitations by subsequently filing documents that purport to "relate back" to previously submitted documents that were, in themselves, insufficient to toll the statute.

*Sibley v. Culliver*, 377 F.3d at 1204, *citing Moore v. Crosby*, 321 F.3d 1377, 1381 (11th Cir. 2003); *Jones v. Secretary, Florida Dept. of Corrections*, 499 Fed.Appx. 945, 951 (11th Cir. 2012). Accordingly, since Bolin's initial motion was not "properly filed," it could not toll the AEDPA limitation period. In other words, once his limitation expired, "there was nothing left to toll." *Sibley v. Culliver*, 377 F.3d at 1204.

The only way for Bolin to avoid the time bar under § 2254(d)(1) is to demonstrate that equitable tolling applies. *Sibley v. Culliver*, 377 F.3d at 1204 (limitations period under § 2244(d), "like most other nonjurisdictional limitations periods-is also subject to equitable tolling.").[4] Rather than attempting to demonstrate that equitable tolling applies, however, Bolin contends that his corrected Rule 3.851 motion relates back under Florida law and therefore should be considered to have been filed prior to the expiration of the one year AEDPA limitation period. (Dkt. 30, p. 6)("Because the motion was timely filed, it is not necessary to address equitable tolling."). Specifically, relying on a 2005 Florida Supreme Court decision, Bolin contends that he "is entitled to have the January 18, 2006 motion relate back to the original filing date of October 3, 2005" and "[t]he original motion was filed within the one year AEDPA requirement." Id., at p.

---

[4] Bolin would have to demonstrate diligence and extraordinary and unavoidable circumstances beyond his control. *Id.* One can reasonably infer that any lack of diligence in filing a timely Rule 3.851 motion and the invalid oath in the initial Rule 3.851 motion would likely have been the responsibility of counsel. While there is no *per se* approach to equitable tolling, simple negligence or excusable neglect on the part of counsel would not warrant equitable tolling. *See Holland v. Florida*, 130 S.Ct. 2549, 2564 (2010).

4

5.

Bolin's reliance on *Bryant v. State*, 901 So.2d 810 (Fla. 2005) is misplaced. Although the Florida Supreme Court in *Bryant* observed in *dicta* that an amended Rule 3.851 motion would have related back to an original filing which had been stricken because of deficiencies, that is a matter of Florida law and procedure. Whether Bolin's corrected Rule 3.851 motion relates back to his initial motion for purposes of the AEDPA "rest[s] on the nature of the federal limitations period and federal law." *Jones v. Secretary, Florida Dept. of Corrections*, 499 Fed. Appx. at 945, 952 (11th Cir. 2012). As noted, precedent in this Circuit compels a conclusion that Bolin's corrected Rule 3.851 motion did not, as a matter of federal law and application of the AEDPA, relate back to his improperly filed initial Rule 3.851 motion and accordingly, Bolin's federal habeas petition is time barred.[5]

It appears that Respondent inadvertently miscalculated the time limitation when it responded to Bolin's federal petition. However, because Bolin offers no basis on which to apply equitable tolling, he could not have been significantly prejudiced by the delayed focus on the AEDPA limitations issue. Nothing he could have done would change the fact that the AEDPA limitation period expired before he had a "properly filed" Rule 3.851 motion pending in state court. In the interest of justice, however, the merits of Bolin's federal habeas petition will be addressed. *See Day v. McDonough* 547 U.S. at 210.

## Facts Underlying Conviction

In affirming Petitioner's conviction on direct appeal, the Florida Supreme Court

---

[5] Respondent's request for leave to amend its Answer to raise the untimeliness of Bolin's petition (Dkt. 29) is GRANTED. *See Day v. McDonough*, 547 U.S. 198, 209-10 (2006).

summarized the facts underlying Bolin's conviction:

> Mathews' body was discovered on December 5, 1986, near the side of a road in rural Pasco County. The body was found wrapped in a sheet imprinted with a St. Joseph's Hospital logo. The body had multiple head injuries, was shoeless, and was wet, although it had not rained recently. The victim's car keys were found close to the body. Evidence collected from the scene included nylon pantyhose and a pair of white pants. There was a single set of truck tire tracks leading to the body. The victim's car was found the next day by Mathews' boyfriend, Gary McClelland, who was worried about her disappearance and attempted to trace her steps after she left work the previous day. The victim's red Honda was found parked at the Land O' Lakes Post Office, with its headlights still on. The victim's mail was found scattered on the ground, and her purse was found undisturbed on the seat inside her car.
>
> Bolin's half-brother, Phillip, testified that he was awakened by Bolin on the night of December 4, 1986. Bolin appeared to be nervous and told Phillip that he needed Phillip's help. The two walked outside, and then Phillip heard a moaning sound, which he thought could have been a wounded dog. Instead, he saw a sheet-wrapped body, and Bolin told him that the girl was shot near the Land O' Lakes Post Office. Bolin then walked over and straddled the body with his feet, raised a wooden stick with a metal end, and hit the body several times. Phillip said that he turned away because he was scared to watch, but compared the sound to hitting a pillow with a stick. Bolin next turned on a water hose and sprayed the body. Bolin demanded that Phillip help him load the body onto the back of a black Ford tow truck, and Phillip helped by picking up the body by the ankles. Phillip testified that he noticed there were no shoes on the body and that the girl was wearing pantyhose. Phillip refused Bolin's offer of money to go with him to dispose of the body, so Bolin went alone and returned twenty to thirty minutes later. He continued talking to Phillip about the girl, stating that she had been shot in a drug deal.
>
> At school the next day, Phillip talked with his friend, Danny Ferns, about what happened the night before and took Danny to where the body had been. Danny testified at trial, to corroborate Phillip's account of the murder, that there were blood stains on the ground at the site and that the grass in the area was disturbed. The State presented other corroborating evidence, which included the testimony of Rosie Kahles Neal. At the time of the murder, Neal co-owned with her now-deceased husband Kahles and Kahles, Inc., the business that employed Bolin as a tow truck driver. She testified that the truck Bolin was driving on the night of the murder was not returned that night, and she thought the truck had been stolen by Bolin because he could not be located and it was the first call he had handled by himself. Neal testified that Bolin was late coming to work the next morning,

was wearing the same clothes as he had the day before, and had a foul smell. She further testified that Bolin played with and carried a knife and got excited when the story of the missing girl, Mathews, was reported on the news. Her testimony also corroborated the murder weapon, as she testified that she gave Bolin a "tire buddy" on the night of the murder. The tire buddy was a two-foot-long wooden club, which was drilled out and filled with lead.

Michelle Steen also offered corroborating testimony. Michelle Steen was married to Bolin's cousin, David Steen. In 1987, while Bolin visited their home, he volunteered that he had killed and beaten a girl in Florida and put a hose down her throat, and that Phillip had watched him do it.

The State then offered the perpetuated videotaped testimony of Cheryl Coby, Bolin's ex-wife, who had died after the first trial. She had been a severe diabetic, was hospitalized numerous times in 1986, often brought home hospital towels and sheets from St. Joseph's Hospital, and identified the sheet that had been wrapped around Mathews' body as a hospital sheet resembling the ones she brought home. Cheryl Coby had a post office box at the Land O' Lakes Post Office, and Bolin picked up her social security checks there when she was in the hospital.

The State also offered DNA testimony indicating that Bolin could have been the source of the semen found in a stain on Mathews' pants. Federal Bureau of Investigation forensic serology expert John R. Brown testified that he could not eliminate Bolin as the contributor of the semen stain but could eliminate Gary McClelland, Mathews' boyfriend, as the source of the stain. David Walsh, a molecular biologist, extracted DNA from the stain on the pants and found that he could exclude both the victim and McClelland as the donors of the stain on the pants. Walsh found that five of the six bands of DNA detected in the stain matched five of the six bands from Bolin's DNA. Walsh was not able to visualize one band because of the small amount of DNA remaining on the pants. Dr. Christopher Basten, an expert in population genetic frequency, testified that Bolin was 2100 times more likely to be the source of the semen than a random, unrelated person.

*Bolin v. State*, 869 So.2d at 1198-99.

### State Court Post Conviction Proceedings

Relevant to the instant Petition, in his Rule 3.851 motion, Bolin claimed that his trial attorney was ineffective in (1) failing to object to testimony of Danny Ferns that he saw blood on the ground where Philip Bolin told him the body had been, and (2) failing to call Bolin's father, Ray Bolin, Sr.,

7

to rebut Danny Ferns' testimony. In denying relief on these claims, the state trial court applied the correct standard applicable to claims of ineffective assistance of counsel set forth in *Strickland v. Washington*, 466 U.S. 668 (1984) (Ex. C 2, p. 134).

Analyzing the claims under *Strickland*'s two pronged standard, the Florida Supreme found, with respect to the failure to object to Ferns' testimony, that counsel's performance was not deficient and even if it had been, Bolin had not demonstrated prejudice resulting from the alleged deficiency sufficient to undermine confidence in the outcome of the trial. *Bolin v. State*, 41 So.3d 151, 158 (Fla. 2010). With respect to the attorney's decision not to call Ray Bolin, Sr., the Court agreed with the state trial court that the "decision not to call Bolin Senior was a tactical decision made by counsel, and made with the agreement of Defendant." *Bolin v. State*, 41 So. 3d at 159.

In his federal habeas petition, Bolin contends that the Florida Supreme Court's decision "was an unreasonable application of clearly established federal law with regard to the effective assistance of counsel" (Dkt. 1, p. 4).[6]

## Standards of Review

This habeas case is governed by 28 U.S.C. § 2254, as amended by the AEDPA. *Ward v. Hall*, 592 F.3d 1144, 1155 (11th Cir. 2010). The decision of the Florida Supreme Court rejecting Bolin's claims of ineffective assistance of counsel cannot be overturned unless the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law," or was "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2); *Harvey v. Warden, Union Correctional*

---

[6] Bolin raised seven grounds in his Rule 3.851 motion, including five claims of ineffective assistance of counsel. His appeal from the denial of his Rule 3.851 motion raised two claims of ineffective assistance of counsel, the claims he raises in the instant federal habeas petition. *Id.* 869 So.3d at 154.

*Institution,* 629 F.3d 1228, 1250 (11th Cir. 2011), *cert. denied,* 132 S. Ct. 577 (2011); *Kearse v.*

*Florida Department of Corrections,* 669 F.3d 1197, 1198 (11th Cir. 2011); *Williams v. Taylor,*

529 U.S. 362 (2000); *Robinson v. Moore,* 300 F.3d 1320 (11th Cir. 2002); *Van Poyck v. Florida*

*Department of Corrections,* 290 F.3d 1318 (11th Cir. 2002).

A state court's adjudication is "an unreasonable application of" clearly established federal law

if the state court "identifies the correct governing legal principle from th[e] Court's decisions but

unreasonably applies that principle to the facts of the prisoner's case." *Williams,* 529 U.S. at 412.

Habeas relief will not be granted simply because the state court applied federal law erroneously or

incorrectly. *Id.* at 411. Bolin must show that the Florida Supreme Court's application of federal law

was objectively unreasonable. *Bell v. Cone,* 535 U.S. 685, 694 (2002) (citing *Williams, supra*).

Under the AEDPA, state court rulings are evaluated under a  "highly deferential standard"

which "demands that state-court decisions be given the benefit of the doubt." *Morris v. Secretary,*

*Dept. of Corrections,* 677 F.3d 1117, 1125 (11th Cir. 2012) (*quoting Renico v. Lett,* 130 S.Ct. 1855,

1862 (2010)).  The habeas petitioner "must show that the state court's ruling on the claim being

presented in federal court was so lacking in justification that there was an error well understood and

comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v.*

*Richter,* 131 S.Ct. 770, 786 -87(2011).  Stated another way, "[a]state court's determination that a

claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the

correctness of the state court's decision." *Morris v. Secretary, Dept. of Corrections,*  677 F.3d at

1125 (*quoting  Harrington,* 131 S.Ct. at 786)).

### Necessity of Evidentiary Hearing

The state post conviction court conducted a full and fair evidentiary hearing on Bolin's

allegations of ineffective assistance of counsel. Bolin was afforded the opportunity to develop the record on his claims, and he makes no showing or complaint that his opportunity was thwarted. The state court's factual findings are "presumed to be correct." 28 U.S.C. § 2254(e)(1). Bolin has not shown that the Florida Supreme Court's decision "was based on an unreasonable determination of the facts. . ." 28 U.S.C. § 2254(d)(2).   An evidentiary hearing is therefore not required because neither of Bolin's claims turn on any unresolved or undeveloped issues of fact.

**Ineffective Assistance of Counsel Standard**

To demonstrate ineffective assistance of counsel, Bolin must meet the test established by *Strickland v. Washington, supra*:

> According to *Strickland*, first, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998) (*citing Strickland*, 466 U.S. at 687). In sum, to prevail on his claims of ineffective assistance of counsel, Bolin must  demonstrate (1) that counsel's performance was deficient and (2) "there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*

In assessing a lawyer's performance, there is a strong presumption that counsel's trial performance was not ineffective. *Strickland*, 466 U.S. at 690; *Chandler v. United States*, 218 F.3d 1305, 1314 (11th Cir. 2000) (en banc), *cert. denied*, 531 U.S. 1204 (2001) ("[c]ourts must 'indulge [the] strong presumption' that counsel's performance was reasonable and that counsel 'made all significant decisions in the exercise of reasonable professional judgment.'").   The evaluation of

counsel's performance is an objective one, conducted from counsel's perspective at the time. *Strickland*, 466 U.S. at 689. The only determination is whether a lawyer's performance was within 'the wide range of professionally competent assistance.'" *Van Poyck v. Fla. Dept. of Corrections,* 290 F.3d 1318, 1322 (11th Cir. 2002)(*quoting Strickland*, 466 U.S. at 690). Bolin must establish that no objectively competent lawyer would have taken the action that his lawyer took. *Id.; Chandler*, 218 F.3d at 1315.

Tactical decisions within the range of reasonable professional competence are not subject to collateral attack, unless a decision was so "patently unreasonable that no competent attorney would have chosen it." *Adams v. Wainwright*, 709 F.2d 1443, 1445 (11th Cir. 1983). And trial strategy cannot be second guessed, as "judicial scrutiny of counsel's performance must be highly deferential." *Chandler,* 218 F.3d at 1314 (quoting *Strickland v. Washington,* 466 U.S. at 689).

This Circuit has succinctly summarized these principles and a habeas petitioner's burden of demonstrating deficient performance:

> The performance inquiry will generally boil down to whether trial counsel's actions (or inactions) were the result of deficient performance or sound trial strategy. See *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065 ("[T]he defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " (citation omitted). To protect counsel's independence, we start with the strong presumption that trial counsel's performance was constitutionally adequate. Id.
>
> Two principles underlie this presumption. First, the Supreme Court has time and again counseled against judging trial counsel's performance with the benefit of hindsight. Id.; see also Yarborough v. Gentry, 540 U.S. 1, 8, 124 S.Ct. 1, 6, 157 L.Ed.2d 1 (2003) (per curiam) ("The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight."); (citation omitted). Second, trial advocacy is not a science, but an art; there are few "right" answers in the proper way to handle a trial. Strickland, 466 U.S. at 693, 104 S.Ct. at 2067 ("Representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another.").

11

This presumption is an evidentiary presumption that carries through the trial. Chandler v. United States, 218 F.3d 1305, 1314 n. 15 (11th Cir.2000) (en banc). Thus, a petitioner must not present evidence merely to refute the presumption. Rather, the petitioner must present evidence that outweighs the presumed evidence of competence. Kimmelman v. Morrison, 477 U.S. 365, 384 106 S.Ct. 2574, 2588, 91 L.Ed.2d 305 (1986) ("[T]he defendant must rebut this presumption by proving that his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy."). Therefore, " 'where the record is incomplete or unclear about [counsel]'s actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment.' " Chandler, 218 F.3d at 1314 n. 15 (quoting Williams v. Head, 185 F.3d 1223, 1228 (11th Cir.1999)).

We do not apply fixed or rigid rules when evaluating trial counsel's performance. Strickland, 466 U.S. at 688–89, 104 S.Ct. at 2065. Rather, a petitioner receives ineffective assistance where the representation "[falls] below an objective standard of reasonableness," id. at 688, 104 S.Ct. at 2064, reasonableness being the "prevailing professional norms," Wiggins v. Smith, 539 U.S. 510, 521, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003). To put it another way, trial counsel's error must be so egregious that no reasonably competent attorney would have acted similarly. See Wood v. Allen, 542 F.3d 1281, 1309 (11th Cir.2008), aff'd —— U.S. ——, 130 S.Ct. 841, 175 L.Ed.2d 738 (2010) ("[O]ther attorneys might have done more or less ... or they might have made the strategic calls differently, but we cannot say that no reasonable attorney would have done as [he] did." (quoting Williams, 185 F.3d at 1244)).

*Harvey v. Warden, Union Correctional Institution,* 629 F.3d at 1238 -1239.

## GROUND I

THE FLORIDA SUPREME COURT DECISION HOLDING THAT COUNSEL'S FAILURE TO OBJECT TO IMPROPER LAY OPINION TESTIMONY OF STATE WITNESS DANNY FERNS TO THE EFFECT THAT HE ABSOLUTELY OBSERVED BLOOD ON THE GRASS AT MR. BOLIN'S HOME ON THE DAY AFTER THE CRIME DID NOT CONSTITUTE INEFFECTIVE ASSISTANCE OF COUNSEL (1) IS AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW AS ARTICULATED BY THE UNITED STATES SUPREME COURT IN STRICKLAND V. WASHINGTON, 466 U.S. 668 (1984), AND (2) VIOLATES THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WHERE COUNSEL'S FAILURE TO OBJECT AMOUNTED TO DEFICIENT PERFORMANCE THAT UNDERMINED CONFIDENCE IN THE OUTCOME OF THE PROCEEDINGS. (Dkt. 1 at p. 13-31).

12

**Deficient performance**

In rejecting Bolin's claim that trial counsel (John Swisher) was ineffective in "failing to object to the descriptive use of what appeared to be blood in Danny Ferns' testimony," the Florida Supreme Court agreed with the state trial court that Ferns' "testimony would not have been excluded even if counsel had objected." *Bolin v. State*, 41 So. 3d at 156. Citing Section 90.701, Florida Statutes, and precedent dating to 1898 approving the admission of lay witness testimony mentioning blood, the Court found that it was unlikely "that Ferns could have conveyed what he saw without using the word blood" or that Ferns' testimony mislead the jury to Bolin's prejudice. 41 So. 3d at 157.[7] Quoting from its own precedent, *Gardner v. State*, 480 So.2d 91 (Fla. 1985), the Court concluded: "A lay witness may give opinion testimony so long as the opinion testimony does not mislead the trier of fact." *Id.*

In the context of the admissibility of lay opinion testimony under Section 90.701, the Florida Supreme Court's finding that an objection to Ferns' testimony would have been overruled even if Bolin's counsel had objected was not objectively unreasonable. Moreover, deference is accorded the Court's determination that Ferns' testimony would have been admissible under Florida law. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (2001) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Anderson v. Sec'y for the Dep't of Corr.*, 462 F.3d 1319, 1330-31 (11th Cir. 2006) (state's interpretation of its own laws or rules provides no basis for federal habeas relief); *Sims v. Singletary*, 155 F.3d 1297, 1308 (11th Cir.

---

[7] Under Florida Statute 90.701, a lay witness may testify in the form of inference or opinion if the "witness cannot readily, and with equal accuracy and adequacy, communicate what he or she has perceived to the trier of fact without testifying in terms of inferences or opinions and the witness's use of inferences or opinions will not mislead the trier of facts to the prejudice of the objecting party."

1998)("We will not challenge a state court's determination of state law."), *cert. denied*, 527 U.S. 1025 (1999); *Osborne v. Wainwright*, 720 F.2d 1237, 1238 (11th Cir. 1983).

Bolin is wrong that Ferns' testimony was "clearly improper." (Dkt. 19, p. 7). As discussed, the testimony was admissible under Florida law and an objection would have been overruled. In sum, Swisher could not have been ineffective in failing to object to evidence which was otherwise admissible. *Sims v. Singletary,* 155 F.3d at 1308 ("[W]e are not persuaded that Sims's attorneys were ineffective by failing to object to the use of hypnotically refreshed testimony since the law at the time of Sims's trial supported the admissibility of such testimony.").

It follows, therefore, that the Florida Supreme Court's determination that counsel's failure to object to Ferns' testimony was not deficient performance was not "contrary to, or involve[] an unreasonable application of, clearly established Federal law," or "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2).

Moreover, the Florida Supreme Court did not rest its decision solely on the admissibility of Ferns' testimony. Rather, it evaluated counsel's performance under the *Strickland* standard and found it to have been reasonable. The Court found that although Bolin's counsel "could not remember the exact reason he chose not to object to Ferns' testimony, it was possible that he was attempting to discredit that there was ever anything on the ground for Ferns to identify." 41 So.2d at 158. The Court noted that counsel's theory of the case, "that the hose used to wash off Matthew's body that left her and the grass wet would have washed away any blood," was not unreasonable.

The Florida Supreme Court essentially found that the decision not to object was consistent with counsel's theory of defense and implicitly found that the decision not to object was a matter of

14

trial strategy. This was not an unreasonable determination of the facts, as a review of the trial transcripts demonstrates. Swisher's opening statement, cross examination of Ferns, and closing argument demonstrate a planned strategy to discredit Ferns' testimony as implausible, since Phillips testified that Bolin had hosed the body off. Swisher's failure to object was consistent with that strategy and, as the Florida Supreme Court found, consistent with his theory of defense.

The evaluation of counsel's performance is an objective one, conducted from counsel's perspective at the time. *Strickland*, 466 U.S. at 689. The only determination is whether a lawyer's performance was within 'the wide range of professionally competent assistance.'" *Van Poyck v. Fla. Dept. of Corrections,* 290 F.3d 1318, 1322 (11th Cir. 2002)(*quoting Strickland*, 466 U.S. at 690). Tactical decisions within the range of reasonable professional competence are not subject to collateral attack, unless a decision was so "patently unreasonable that no competent attorney would have chosen it." *Adams v. Wainwright*, 709 F.2d 1443, 1445 (11th Cir. 1983). And trial strategy cannot be second guessed, as "judicial scrutiny of counsel's performance must be highly deferential." *Chandler,* 218 F.3d at 1314 (*quoting Strickland v. Washington,* 466 U.S. at 689).

Since Swisher was unable to recall his reasons for not objecting, the record is essentially unclear as to his trial tactics, and "[t]he presumption that counsel rendered effective assistance and made all significant decisions in the exercise of reasonable professional judgment is particularly important . . . ." *Williams v. Head*, 185 F.3d 1223, 1227 (11th Cir. 1999), *cert. denied*, 530 U.S. 1246 (2000). Bolin must therefore overcome the strong presumption that Swisher "did what he should have done, and that he exercised reasonable professional judgment." *Harvey v. Warden, Union Correctional Institution,* 629 F.3d at 1245, quoting *Williams v. Head*, 185 F.3d at 1227-28. And Bolin "bears a difficult burden" in rebutting this strong presumption. *Id., quoting Waters v.*

15

*Thomas*, 46 F.3d 1505, 1512 (11th Cir. 1995)(en banc), *cert. denied*, 516 U.S. 856 (1995).

Before evaluating Swisher's trial performance, the Florida Supreme Court acknowledged the presumption that trial counsel's challenged action "might be considered sound trial strategy," (quoting *Strickland* at 466 U.S. at 689), and that "[j]udicial scrutiny of counsel's performance must be highly deferential." 41 So.3d at 155. And, citing from its own precedent applying *Strickland*, the Court premised its evaluation of Swisher's performance on the principle that "strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." *Id.*

The Florida Supreme Court's discussion of this claim demonstrates that it applied the correct performance prong under *Strickland*, avoided hindsight in evaluating Swisher's trial performance, and implicitly deferred to Swisher's trial strategy consistent with the presumption that his trial conduct was a matter of sound trial strategy. And the Court applied an objective standard of reasonableness in evaluating that strategy. Its decision was not contrary to *Strickland* or involve an unreasonable application of the principles discussed in *Strickland*.

Bolin is required to establish that no objectively competent lawyer would have taken the action that his lawyer took. *Id. (citing Chandler*, 218 F.3d at 1315). Bolin has not shown that Swisher's strategy of attacking the plausibility of Ferns' description of what he saw rather than objecting was a trial tactic that no other objectively competent lawyer would have taken. Consistent with the Florida Supreme Court's decision rejecting this claim, viewed from an objective perspective, Swisher's trial strategy and theory of defense cannot be said to have been so "patently unreasonable that no competent attorney would have chosen it." *Adams v. Wainwright*, 709 F.2d 1443, 1445 (11th Cir. 1983).

The record demonstrates that at the time of Bolin's trial, Swisher was an exceptionally experienced criminal defense attorney, and well able to make informed strategic trial decisions. He had been practicing for 25 years and had tried more than 20 capital cases (Ex. C 3, p. 321-22). Moreover, in preparing his defense of Bolin, Swisher had the benefit of reading the trial transcript of Bolin's previous trial (Ex. C 3, p. 319-20; 333).  He was therefore aware of what Ferns had testified to in the prior trial, and planned his strategy around that testimony (Ex. C 3, p. 323). And he would have been aware that an objection to Ferns' testimony had been overruled in the prior trial. (Ex C 6, p. 557).

While Swisher could not recall the specific reason he did not object to Ferns' testimony, his testimony demonstrates that he possessed an understanding of lay witness opinion testimony under Florida law, particularly concerning the identification of blood and when an objection could be made to lay opinion testimony, and that he had researched the admissibility of lay opinion testimony (Ex. C 3, p. 291- 292; 344). And he disagreed with the suggestion that he should have objected to Ferns' testimony, pointing out that "there's other ways also." (Id. at p. 293-294; 295). He surmised that he may have attempted to minimize Ferns' testimony with other the evidence (use of the water hose), and "that might be another way to do just as effectively objecting to a fact if they gave an opinion." (Ex. C 3, p. 294). And he added,  "[i]f I tried to attack Denny Ferns' testimony through other ways, then I would assume that's why I did it the way I did it." (Id. at p. 295). [8]  Swisher surmised that he

---

[8] According to Swisher:

  If I tried to attack Danny Ferns' testimony through other ways, then I would assume that's why I did
  it the way I did it." If I tried to attack Danny Ferns, the fact that he was young, the fact that there was
  a hose, the fact that water may have dissipated the blood, to destroy the testimony of Danny Ferns not
  only for blood, but his other testimony, I think that would be just as effective as saying objection.
  . . .

17

may have decided to forego an objection and focus on attacking Ferns' testimony. (Id.). More specifically, he testified: "If I followed it up with other questions concerning that testimony, then I would have to say I had a tactical reason to do that." (Id. at p. 296).

The record demonstrates that Swisher did follow up Ferns' testimony with cross examination in an attempt to show that what Ferns described was unlikely. For example, Swisher had Ferns describe a three foot circle of blood (Ex. C 1, p. 34). He had Ferns admit that he did not look at the blood until after the end of the school day, even though he described the blood as "fresh." (Ex. C 1, p. 35). And when Ferns described seeing a hose in the area, Swisher brought out that the grass was dry and it had not rained, another plausible inconsistency with Phillip Bolin's testimony about Bolin using the hose to wash off the body. (Ex. C 1, p. 35 - 36). Further suggesting that the decision not to object was tactical is Swisher's objection on hearsay grounds to a question posed to Ferns' immediately after his testimony about the blood (Ex. C1, p. 27).

In his Reply, Bolin takes issue with the Florida Supreme Court's finding that counsel's "hypothesized tactical reasons" for not objecting constituted reasonable trial strategy, based on his theory that "the hose used to wash off Matthews' body . . . would have also washed away any blood." 41 So. 2d at 158. Bolin argues that objecting to Ferns' testimony was not "mutually exclusive" to an attack on his credibility, and that "the Florida Supreme Court's justification of defense counsel's failure to object on the grounds that counsel was exercising a reasonable trial strategy simply is not supported by the facts." (Dkt. 19, p. 3 - 5).

---

Well, sometimes you can let something come into evidence if you're trying to destroy the whole witness themselves. You might want something to go in so you can attack the whole testimony of a witness. You may have said something else important that you wanted also to get the jury to disregard. If you say he was incorrect here, he might be incorrect there. So I don't know that that always follows. It's not a black and white test.

According to Bolin, "[i]f counsel's theory was that there was no blood on the ground, counsel could advance that theory by using both modes of attack." By objecting, Bolin contends, "he would not have jeopardized his theory of the case at all." (Id. at p. 4). Bolin posits what the ruling on an objection may have been and what strategy counsel could have pursued, depending on the ruling (Id. a p. 5). But this is nothing more than *post hoc* criticism of Swisher's trial performance.

Merely disagreeing with counsel's trial strategy, and even presenting a persuasive argument that a different strategy may have been the better choice, does not overcome the strong presumption that counsel's strategy was reasonable. *See Strickland*, 466 U.S. at 689, 104 S.Ct. 2052 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight...."). Rather, to overcome the presumption that Swisher's trial strategy was reasonable, Bolin "must present evidence that outweighs the presumed evidence of competence," not merely evidence which refutes the presumption. *Harvey v. Warden, Union Correctional Institution*, 629 F.3d at 1238 -1239, citing *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) ("[T]he defendant must rebut this presumption by proving that his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy."). Bolin has not rebutted the presumption that Swisher's decision not to object to Ferns' testimony was reasonable trial strategy.

Bolin acknowledges that Swisher's theory was that there was no blood at all on the ground (Dkt. 1, p. 22, 34). Swisher's opening statement in the trial demonstrates that he anticipated Ferns' testimony and intended to discredit it by pointing out that Phillip claimed that Bolin washed the body off with a hose:

You'll also hear from Danny Ferns, a friend of Phillip Bolin, who was told - - who

19

also told no one what Phillip had supposedly told him four years ago. He will say
that a day or two after being told this story he saw blood on the ground. Now, even
though the body was hosed off, according to Phillip, he's going to say he sees blood
on the grass, outdoors. He doesn't say he saw any flies. He doesn't say he saw any
animals drawn to this blood stain that's a day or two old, but he will say that he saw
what looked like blood on grass after it had been hosed off.

(Ex. A 13, p. 524).

His cross examination of Ferns established a foundation for this theory. Swisher had Ferns

describe a "thee-foot circle" of blood, but acknowledge that it was not until after school that he saw

the blood. (Ex. A 15, p. 882-83). During final argument, Swisher referenced the "story" of Danny

Ferns:

Now, if you want to buy the story of Danny Ferns, blood was in a three-foot circle
splattered everywhere. How about the clothes. Any blood on the clothes? If there
was, you would have heard about it. . . .

(Ex. A19, p. 1599).

Good or bad, Swisher's strategy was certainly not an indifferent one. He was well aware that

Ferns would be asked to describe what he saw on the ground where Phillip Bolin told him his uncle

had hosed off the body, and that his testimony was intended to corroborate Phillip Bolin's. Swisher

was therefore able to plan his cross examination and theory of defense around that testimony, as well

as the testimony of the other prosecution witnesses. His opening statement, cross examination of

Ferns, and final argument therefore demonstrate a calculated tactical approach to Ferns' testimony,

consistent with his theory of defense.

Tactical decisions such as whether to pursue a particular defense, or rely on a line of defense

to the exclusion of others, will not be second guessed, even if the decision proved to be unsuccessful.

*Chandler,* 218 F.3d at 1315. And where, as here, the record is incomplete or unclear because counsel

20

simply cannot recall his reasons for his actions, it will be presumed that counsel "did what he should have done, and that he exercised reasonable professional judgment." *Harvey v. Warden, Union Correctional Institution*, 629 F.3d at 1245.

Accordingly, Ground One is due to be denied because Bolin cannot satisfy the first prong of the *Strickland* test for ineffective assistance of counsel. And Bolin has not demonstrated prejudice from any alleged deficiency in Swisher's trial performance in this claim. The Florida Supreme Court's determination that Swisher's trial conduct was not deficient was not one that fairminded jurists could disagree on. As such, its decision was not "contrary to, or involve[] an unreasonable application of, clearly established Federal law."

**Prejudice**

The Florida Supreme Court, noting the evidence against Bolin, also found that "even if we found that Swisher was deficient, Bolin has not established prejudice sufficient to undermine confidence in the outcome of his trial." 41 So.3d at 158.[9] In making this finding, the Court applied the correct standard for assessing prejudice under *Strickland*. This court cannot say that the finding of no prejudice was "contrary to, or involved an unreasonable application of, clearly established Federal law," or constituted "an unreasonable determination of the facts." 28 U.S.C. § 2254(d)(2).

The evidence against Bolin was compelling. It included his step-brother Phillip's description of Bolin's actions on the night of the murder, including Bolin's possession of a black tow truck which matched the one Bolin drove but failed to return to his employer that day; that Bolin had used

---

[9] "Ferns' testimony corroborated that of Phillip Bolin. Phillip testified that he witnessed Bolin strike Matthews with a metal-tipped stick matching the description of one given to him by his employer. Both boys' testimony that the ground was wet was corroborated by the physical evidence that Matthews was found wet although it had not rained recently. Additionally, a semen sample found on the victim matched Bolin's blood sample. Furthermore, it is not likely that the jury was misled by Ferns' testimony. Accordingly, this claim is denied." *Bolin v. State*, 41 So.3d at 158.

a metal tipped stick to beat Matthews which matched the description of the tire buddy given to him by his employer; that he used a hose to wash the body, that the body was wet when found; that the body was wrapped in a St. Joseph's Hospital sheet similar to hospital sheets Bolin's wife brought home with her after a stay at that hospital; and that the body was shoeless and wearing pantyhose, consistent with Phillip's description of the body he helped Bolin load onto the tow truck. According to Bolin's employer, Bolin was late to work the morning after Matthews disappeared, was wearing the same clothes from the day before, and had a foul smell. Bolin was playing with a knife he carried and got excited when the story of the missing girl was heard. Bolin's DNA matched semen found on Matthews. And he essentially confessed to Michelle Steen.

Under these circumstances, as the Florida Supreme Court found, it is unlikely the outcome of the trial would have been different if Ferns had not been permitted to tell the jury that he saw what appeared to be blood on the ground where Phillip told him the body had been. Even without the reference to "blood," Ferns' testimony would have largely corroborated Phillip Bolin's testimony. As the Florida Supreme Court noted, "[b]oth boys testimony that the ground was wet was corroborated by the physical evidence that Matthews was found wet although it had not rained recently." 41 So. 3d at 158. Moreover, Phillip Bolin testified without objection that he and Ferns saw blood on the ground when he showed Ferns the area where the body had been (Ex. A15 at 787).

In sum, Bolin has not demonstrated that the result of his trial would have been different if Swisher had successfully objected to Ferns' testimony. Bolin's contention that the Florida Supreme Court's finding of no prejudice was based on an unreasonable factual determination is rejected, or a decision that was "contrary to, or involved an unreasonable application of, clearly established Federal law."

Nor can it be said that the admission of Ferns' testimony, even if erroneously admitted, violated Bolin's federal due process rights.[10]   To constitute a violation of due process, the complained of error must have been of "such magnitude as to deny fundamental fairness" to Bolin's trial. *Collins v. Francis*, 728 F.2d 1322, 1336 (11th Cir. 1984), *cert. denied*, 469 U.S. 963 (1984). "The admission of prejudicial evidence justifies habeas corpus relief only if the evidence 'is material in the sense of a crucial, critical, highly significant factor.'" *Osborne v. Wainwright*, 720 F.2d at 1238, quoting *Hills v. Henderson,* 529 F.2d 397, 401 (5th Cir.1976).

Ferns' testimony that he saw what appeared to be blood on the ground, considered against the other evidence linking Bolin to the murder, was not so crucial, critical or highly significant that Bolin was deprived of a fair trial. As noted, the testimony was admissible under Florida's law. Moreover, there was substantial evidence independent of Ferns' testimony connecting Bolin to the murder. And as discussed by the Florida Supreme Court, Swisher drew on Ferns' testimony to support his theory of defense.

Bolin has not demonstrated either deficient performance or prejudice under *Strickland*. Where, as here, a habeas petitioner is unable to establish either prong of the *Strickland* analysis, his claim must be dismissed. *See Coulter v. Herring*, 60 F.3d 1499, 1504 (11th Cir. 1995). Accordingly, Ground One is due to be dismissed.

---

[10] Generally, a federal habeas court will not review a state court's determination of the admissibility of evidence, except where the state court's ruling is claimed to have deprived the petitioner of the right to due process. *Tidwell v. Butler*, 415 Fed.Appx. 979, 980 (11th Cir. 2011), citing *Osborne v. Wainwright, supra*. And that inquiry is only whether the error was of such magnitude as to deny fundamental fairness to the criminal trial. *Id.*

**GROUND II**

THE FLORIDA SUPREME COURT DECISION HOLDING THAT THE FAILURE OF DEFENSE COUNSEL TO CALL OSCAR RAY BOLIN, SR., AS A WITNESS WHO WOULD HAVE TESTIFIED THAT THE RED SUBSTANCE SEEN IN THE GRASS BY DANNY FERNS WAS PAINT THAT HE HAD USED ON CARNIVAL EQUIPMENT DID NOT CONSTITUTE INEFFECTIVE ASSISTANCE OF COUNSEL (1) IS AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW AS ARTICULATED BY THE UNITED STATES SUPREME COURT IN STRICKLAND V. WASHINGTON, 466 U.S. 668 (1984), AND (2) VIOLATES THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WHERE COUNSEL'S PERFORMANCE WAS DEFICIENT AND WHERE THAT DEFICIENT PERFORMANCE OPERATED TO THE PREJUDICE OF MR. BOLIN'S DEFENSE. (Dkt. 1 at docket pgs. 32-44).

In rejecting Petitioner's second claim that counsel was ineffective in failing to call Ray Bolin, Sr. as a witness to rebut the testimony of Danny Ferns, the Florida Supreme Court found that Bolin's trial counsel made a tactical decision not to call him as a witness for several reasons. The Court quoted the state post conviction court, expressly agreeing with its findings:

> Mr. Swisher testified that he spoke to Bolin Senior, but that he made a tactical decision not to call him as a witness for several reasons. First, there is the fact that Bolin Senior was out of state for the two weeks prior to the murder and any spray painting would have been done prior to his departure. See Trial Transcript, p. 1472. Second, there was no way to independently corroborate Bolin Senior's testimony 15 years after the murder. See November 16, 2006 Evidentiary Hearing Transcript, pp. 75-76, 99-101. Third, there is the perceived bias on the part of a father testifying for his son. See id. at 76. Fourth, counsel did not want to risk his being discredited in the guilt phase if he needed him to testify in the penalty phase. See id. at 103, 106-107. And fifth, Bolin Senior was not a good witness. See id. at 75-77. Not only did counsel believe so based on his own interview with Bolin Senior, but he testified that both Defendant and his wife, Rosalie Bolin, told him that Bolin Senior would not be a good witness. See id.

> Furthermore, the information about the spray painting of carnival equipment and the removal of all hoses from the property was presented to the jury in the testimony of Gertrude Bolin, Defendant's stepmother. See Trial Transcript, pp. 1470; November 16, 2006 Evidentiary Hearing Transcript, p. 74-76. Whether the decision not to call Bolin Senior as a witness was the best tactical decision is not at issue in this proceeding. As long as an attorney has considered and rejected alternative courses of action, tactical or strategic choices do not constitute deficient conduct on the part of

the attorney. See Henry v. State, 948 So.2d 609 (Fla.2006). The decision not to call Bolin Senior was a tactical decision made by counsel, and it was made with the agreement of Defendant. Based on the foregoing, the Court finds that counsel was not deficient, and the claim is denied accordingly.

*We agree.*

*Bolin v. State*, 41 So.3d at 159 (emphasis added).

## Deficient performance

The Florida Supreme Court's denial of this claim was not an unreasonable application of clearly established Supreme Court law. The decision of whether or not to call a witness constitutes the "epitome of a strategic decision." *Chandler*, 218 F.3d at 1315, n. 15. Like the decision to pursue a particular defense, or rely on a line of defense to the exclusion of others, the decision not to call a witness will not be second guessed, even if the decision proved to be unsuccessful. *Id.*

The Florida Supreme Court found Swisher's decision not to call Bolin, Sr. and "reserve [his] limited credibility for the penalty phase" a reasonable one. In support of its conclusion, the Court noted that Swisher interviewed Bolin, Sr. before trial and had concerns about his credibility, a concern that Bolin and his wife had shared with Swisher. *Bolin v. State*, 41 So.3d at 159 ("Here, both Bolin and his wife, Rosalie, told trial counsel that Bolin, Sr. would not be a good witness. Swisher confirmed this independently, and determined that Bolin, Sr. would not be a good witness."). The facts and Swisher's testimony during the evidentiary hearing support these findings.

Bolin and his wife explained to Swisher that Bolin, Sr. would not be a good witness (Ex C 3, p. 301). Swisher personally evaluated Bolin, Sr.'s credibility and decided not to call him as a witness (Id. at p, 303).[11] As Swisher explained:

---

[11] Swisher made arrangements to have Bolin, Sr. at the courthouse as a potential trial witness, having paid for him to travel from out of state. (Ex C3 p, 299; 303).

So, no, I did not consider putting them on, and with their agreement, we did not put
mom and dad on the stand. I think I was told that they live in the hollor, H-O-L-L-O-
R, and it wouldn't be a good thing to call them as witnesses. They weren't the brightest people in
the world, it's not their fault, I'm just saying they would not come across well on the witness stand
on these issues.

(Ex C 3, p. 302).

 Swisher was also concerned that Bolin, Sr.'s credibility as a penalty phase witness would

be diminished if his credibility was impugned in the penalty phase (Ex. C 3, p.333). Moreover,

Swisher believed that calling family members to defend a case could be "a disaster." (Id. at p. 302).[12]

And his decision was not made in a vacuum.

In preparing for trial, Swisher read Bolin, Sr.'s testimony from the October 1996 trial as well

as his 1996 telephonic deposition (Ex C 3, p. 325, 345).  He knew that Bolin, Sr. was out of state at

the time of the murder, having left weeks before the murder (Id. at 300). He also knew that Bolin,

Sr. would testify that he had spray painted carnival parts with red, red-orange and blue paint in the

area where the body had been before he left, some time before Thanksgiving. Swisher knew,

however, that there was no independent evidence to prove that "many years before." (Ex. C 3, p.

301-02; 325-27).  That "was one of the reasons" he decided not call Bolin, Sr. as a witness.

Notwithstanding, Swisher explained that whether or not red paint remained on the ground

from when Bolin, Sr. painted the carnival parts was not a factor in his decision, because his intent

was to show that there was no blood on the ground:

"Whether it was painted or not, it didn't matter, I don't think the blood was there and
that's what I tried to sell."

(Ex. C 3, p. 349).

---

[12] As Bolin points out, Swisher did call Gertrude Bolin during the guilt phase. The fact remains that Swisher
and his client both thought Bolin, Sr. would not be a good witness, supporting Swisher's tactical decision not to call him.

26

Bolin's criticism of Swisher's explanations does not satisfy his burden under *Strickland*. Considering the "strong presumption" that Swisher's decision constituted a trial tactic, one "may not indulge in *post hoc* rationalization for counsel's decisionmaking that contradicts the available evidence of counsel's actions." *Harrington*, 131 S.Ct. at 790. Neither may the court, as Bolin seemingly urges, "insist counsel confirm every aspect of the strategic basis for his or her actions." *Id*. Objective reasonableness is the standard, not counsel's subjective state of mind. *Id*.

Swisher's testimony demonstrates an informed tactical decision not to call an available witness, a decision his client agreed with at the time. The Florida Supreme Court's finding that "[t]he decision not to call Bolin Senior was a tactical decision . . . made with the agreement of Defendant" is exactly what occurred. Since the decision to call a witness constitutes the "epitome of a strategic decision, the Florida Supreme Court's determination that Swisher's decision was reasonable was not an unreasonable application of clearly established federal law under *Strickland.*[13]

Under the deferential standard accorded the Florida Supreme Court's determinations under § 2254(d), "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." *Harrington*, 131 S.Ct. at 788. Here, there clearly is.

**Prejudice**

The Florida Supreme Court additionally found that Bolin was not prejudiced by Swisher's decision not to call Bolin, Sr. as a witness:

> In the present case, it is not likely that Bolin, Sr. would have exonerated Bolin. His testimony could not be corroborated and would not establish definitively that Bolin

---

[13] Nor was it an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(2).

could not have committed the crime. As stated above, Ferns' testimony was corroborated by Phillip Bolin. Even if Bolin, Sr. had testified that there could have been spray paint on the ground, it was not likely to discredit Ferns' version of events.

Additionally, Bolin cannot establish that the outcome of the trial would have been different had Bolin, Sr. testified. Bolin, Sr. would have testified that he spray painted equipment using many colors, including red, approximately three weeks prior to Matthews' murder. It is not likely the spray paint would have remained on the grass, or that-if it had-Ferns would have mistaken the mixture of paint colors as blood. Further, it is not likely that the jury would have believed Ferns mistook weeks-old spray paint for blood. Because Bolin has failed to demonstrate that counsel was deficient or that he was prejudiced, this claim is denied.

*Bolin v. State*, 41 So.3d at 160.

These findings were likewise reasonable determinations of the facts in light of the evidence presented in the state court evidentiary hearing. Even assuming the jury believed Bolin, Sr., and that a mixture of red, red-orange, and blue paint survived the weeks between the painting and the murder, that was not likely to have discredited Ferns' version of events. And it certainly would not have diminished the testimony of Phillip Bolin and the other evidence linking Bolin to Matthews' murder. In sum, Bolin has not shown that there is a reasonable probability that the jury's verdict would have been different if Bolin, Sr. had been called to testify.

Bolin's argument that Bolin, Sr.'s testimony would have "rebutted Ferns' testimony that he absolutely saw blood in the grass, and would have further discredited the testimony of Phillip Bolin, the State's key witness" does not provide a sufficient basis to find that the Florida Supreme Court's application of *Strickland's* prejudice prong was unreasonable under § 2254(d).

It is not enough under *Strickland* "to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland v. Washington*, 466 U.S. at 693. The claimed errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id., at 687.

28

Bolin has failed to demonstrate that the Florida Supreme Court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court. See 28 U.S.C. § 2254 (d)(1). Accordingly, Ground II does not warrant relief.

**Cumulative Error**

Bolin's claim of cumulative error necessarily fails, since neither of his claims of ineffective assistance of counsel have merit. *Morris v. Secretary, Dept. of Corrections*, 677 F.3d at 1132 (where none of individual claims of error or prejudice have merit, "we have nothing to accumulate.").

ACCORDINGLY,

1. Bolin's Petition for Writ of Habeas Corpus (Dkt. 1) is **DENIED**.

2. The **Clerk** is directed to enter judgment against Bolin and close this case.

**CERTIFICATE OF APPEALABILITY**

**IT IS FURTHER ORDERED** that Bolin is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal the denial of his petition. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a certificate of appealability (COA). (Id.). "A [COA] may issue...only if the applicant has made a substantial showing of the denial of a constitutional right. § 2253(c)(2). To make such a showing, Bolin "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4 (1983)).

Bolin cannot make the requisite showing. He complains only of two discreet trial decisions

29

made by Swisher, both of which, by any account, were informed tactical decisions by an experienced criminal defense attorney. Reasonable jurists would not find this court's assessment of the constitutional claims of ineffective assistance of counsel debatable or wrong.

Finally, because Bolin is not entitled to a COA, he is not entitled to appeal *in forma pauperis*.

**DONE AND ORDERED** this ___1st___ day of July, 2013.


JAMES D. WHITTEMORE
United States District Judge


copies to: Counsel of Record